**Illena R. NIXON, Plaintiff,**

v.

**Marvin RUNYON, Defendant.**

**Civ. A. No. 92–5451.**

United States District Court,
E.D. Pennsylvania.

June 30, 1994.

William L. McLaughlin, Jr., William L. McLaughlin Law Offices, Paoli, PA, for plaintiff.

Robert L. Sawicki, Sp. Asst. U.S. Atty., Office of Field Legal Svcs., Postal Serv., Linda S. Stewart, U.S. Postal Service, Philadelphia, PA, for defendant.

## FINDINGS OF FACT, DISCUSSION, AND CONCLUSIONS OF LAW

EDUARDO C. ROBRENO, District Judge.

Plaintiff Illena R. Nixon alleges that her former employer, the United States Postal Service, illegally discriminated against her on the basis of race and physical handicap, and illegally terminated her in retaliation for her filing a claim with the employer's Equal Employment Office. The case was tried to the Court without a jury over the course of four days. This memorandum constitutes the Court's findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52(a).

## I. FINDINGS OF FACT

1. Plaintiff is a member of a protected class by virtue of her race, black,[1] and her handicap, a knee injury.

2. Plaintiff was hired on April 23, 1988, by Arthur LeGar, Jr., who at the time was the Postmaster of the Pottstown Post Office (the "Pottstown P.O."), in the position of part-time flexible ("PTF") city letter carrier. Though this was the plaintiff's first career appointment, she had worked in several temporary assignments at the Pottstown P.O. since September of 1986.

---

1. This is the term plaintiff has used to refer to herself in her submissions, and the Court will do likewise.

3. The essential functions of the PTF city letter carrier position included sorting mail for approximately two hours per day and carrying and delivering mail for approximately six hours per day. The latter required the use of a mail satchel weighing up to thirty-five pounds. *See* Def.'s Ex. 11.

4. Plaintiff was a member of the National Association of Letter Carriers, AFL–CIO (the "NALC"), which was her exclusive bargaining representative.

5. In September of 1988, plaintiff first felt pain in her left knee. She informed her supervisors in October of her pain, claiming that the strain of walking with a mail satchel had caused her injury.

6. Plaintiff duly filed a Notice of Occupational Disease and Claim for Compensation with the United States Department of Labor's Office of Workers' Compensation Programs (the "OWCP"). *See* Def.'s Ex. 7.

7. On November 30, 1988, plaintiff underwent arthroscopic surgery on her left knee. She was designated as being on sick leave status.

8. By February 10, 1989, plaintiff had exhausted her sick leave and was placed on "leave without pay," or "LWOP" status. Under the Employee and Labor Relations Manual (the "ELM"), which governed the relationship between the Postal Service and the members of the NALC, "LWOP is an authorized absence from duty in a nonpay status." Def.'s Ex. 19C (ELM § 514.1(a)).

9. On May 2, 1989, plaintiff's claim for workers' compensation was denied by the OWCP, on the basis that no causal link had been established between her employment and her knee injury. *See* Def.'s Ex. 12.

10. In June of 1989, plaintiff underwent a second surgical procedure on her left knee.

11. Plaintiff was maintained on LWOP status until September 25, 1989, when she returned to her duties as a PTF city letter carrier.

12. On December 29, 1989, plaintiff reported that she had twisted her left ankle while delivering mail. She filed an Accident Report and a Notice of Traumatic Injury. *See* Def.'s Exs. 23A & 23B. A Postal Service

medical officer treated plaintiff, diagnosed a sprained ankle, and ordered "no activity" for five days. *See* Def.'s Ex. 26.

13. Jeffrey Shoch, at that time the Superintendent of Postal Operations at the Pottstown P.O., testified that on the date of the injury, he was at the Pottstown Memorial Medical Center on other matters when plaintiff was brought in for X-rays. He testified that plaintiff stated to him at that time that she had hurt her ankle (and not her knee).

14. When plaintiff returned to work on January 2, 1990, she was placed on "limited duty." A limited duty assignment is provided to employees who suffer from a physical limitation identified by a treating physician and stemming from an on-the-job injury. *See* Def.'s Ex. 47. An employee who suffers a non-job-related injury may request a "light duty" assignment. *See id.* Ex. 6B. An employee whose workers' compensation claim is pending is assigned to limited duty.

15. In mid-January, plaintiff informed Mr. LeGar that she had reinjured her left knee when she twisted her ankle on December 29, 1989. *See* Def.'s Ex. 27. Her treating physician filed a report with the OWCP indicating that she had "wrenched" her knee, *see id.* Ex. 28B, and advised that she should be assigned to sedentary work, *see id.* Ex. 28C.

16. On January 30, 1990, the Postal Service issued to plaintiff a letter of warning for failure to work in a safe manner in connection with the accident of December 29, 1989. This letter was the subject of a grievance by the plaintiff's union representative, and by agreement, the letter was removed from plaintiff's file in June of 1990. The agreement to remove the letter, however, explicitly permitted reference to the discipline by either party in any future judicial proceeding involving the plaintiff. *See* Def.'s Ex. 24.

17. In February of 1990, plaintiff filed a Notice of Recurrence of Disability with the OWCP, claiming that she had reaggravated her knee injury when she twisted her ankle. *See* Def.'s Ex. 29.

18. On February 14, 1990, plaintiff was notified that her step increase in her salary level would be deferred due to excessive days

on LWOP status, per the regulations in the ELM. *See* Def.'s Ex. 17.

19. On February 22, 1990, the denial of worker's compensation benefits on May 2, 1989, was affirmed. *See* Def.'s Ex. 15.

20. On April 10, 1990, plaintiff received a letter of warning for "failure to meet the availability/dependability requirements of [her] position" due to excessive absences from work during the period from January 22 through March 28, 1990. *See* Def.'s Ex. 31. The letter indicated that more severe discipline, including suspension or removal, could be taken if there were further deficiencies. Plaintiff filed a grievance regarding this letter of warning.

21. On April 24, 1990, plaintiff received a letter notifying her that she had been placed on restricted sick leave, requiring her to provide documentation for any future sick leave absences. Failure to provide the documentation would result in a status of "absent without leave," or "AWOL." *See* Def.'s Ex. 33. This letter was sent pursuant to the restricted sick leave provisions of the ELM. *See id.* Ex. 19B.

22. On April 27, 1990, plaintiff underwent a third surgical procedure on her left knee.

23. On May 25, 1990, Mr. Shoch wrote to plaintiff inquiring as to her whereabouts, since the office had "not heard from [her] since April 26, 1990." Def.'s Ex. 34. The letter reminded her that she was under an obligation to report to the Postal Service on her condition every two weeks, and informed her that if she did not return to duty, resign, or submit medical documentation within five days, she would possibly be subject to termination.

24. On May 31, plaintiff made a written request for assignment to "light duties." Def.'s Ex. 35B. She also submitted a status report filled out by her doctor indicating that she could return to sit-down duties on June 4, 1990. *See id.* Ex. 35A.

25. Based on the limitations established by plaintiff's doctor, Mr. LeGar assigned plaintiff to sedentary work. On June 4 and June 5, 1990, she was assigned to sorting flat envelopes, a task she could perform while seated on a carrier case.

26. Plaintiff stated that she could not do the assigned work because the seating she was provided aggravated her knee. She requested different seating, but the Postal Service determined that the seating requested was against safety regulations. At this point, Mr. LeGar determined that there was no other work at the Pottstown P.O. that plaintiff could perform.

27. On June 5, 1990, Mr. LeGar instructed plaintiff that he had secured a limited duty assignment for her at the Southeastern Management Sectional Center ("Southeastern"), the office to which the Pottstown P.O. reported. Southeastern was a larger installation and had the capacity to accommodate plaintiff's medical restrictions. Mr. LeGar instructed plaintiff to report there the next day.

28. Plaintiff failed to report to Southeastern as instructed. She told Mr. LeGar that she had no transportation to reach Southeastern. By letter dated June 13, 1990, Mr. LeGar informed plaintiff that she was listed as AWOL as of June 6, that it was her responsibility to obtain transportation to Southeastern, and that if she failed to report on that day she would be subject to further discipline. *See* Def.'s Ex. 40.

29. Plaintiff reported to Southeastern on June 13, 1990, but thereafter failed to report. *See* Def.'s Ex. 39.

30. On June 26, 1990, Mr. LeGar telephoned plaintiff and inquired as to her absence from Southeastern. When plaintiff repeated that she had no transportation to reach Southeastern, Mr. LeGar advised her that she would be provided with a postal vehicle to use in commuting to Southeastern. *See* Def.'s Ex. 41.

31. Plaintiff reported to Southeastern on June 26 and 27, 1990, using the vehicle provided by the Pottstown P.O. to make the commute from her home to Southeastern.

32. Plaintiff never reported to work again after June 27, 1990. She complained that the drive from Pottstown to Southeastern caused her pain in her right (non-injured) leg. Nothing in plaintiff's medical restrictions precluded her from driving, and her physi-

cian found no objective reason for plaintiff's complaint of pain in her right leg. *See* Def.'s Ex. 30.

33. Plaintiff sought counseling with an Equal Employment Office ("EEO") counselor on July 3, 1990, claiming that her assignment to Southeastern and the deferral of her step increase were discriminatorily based on her race and her injury. *See* Def.'s Ex. 43.

34. On July 10, 1994, Mr. LeGar saw plaintiff on the street and asked her if she had been reporting to Southeastern. She replied that she had not. *See* Def.'s Ex. 42B.

35. On July 16, 1990, plaintiff's step increase was again deferred due to excessive days on LWOP status. *See* Def.'s Ex. 20.

36. Plaintiff was examined by another physician in August of 1990. In addition to restrictions on plaintiff's bending and lifting, this doctor limited plaintiff's driving to one-half hour at a time. *See* Def.'s Ex. 51.

37. On August 20, 1990, the OWCP denied plaintiff's Notice of Recurrence of Disability that had been filed in February of 1990, denying her claim for workers' compensation benefits on the grounds that she had not shown that her knee injury was aggravated by her accident on December 29, 1989. *See* Def.'s Ex. 45.

38. Since plaintiff's claim for benefits had been denied, she was no longer eligible for limited duty. Mr. LeGar informed her of this status change by letter dated August 24, 1990, further advising her that she would have to submit medical documentation if she wished a light duty assignment. The documentation would need to include "a detailed diagnosis, detailed descriptions of [plaintiff's] restrictions and anticipated duration of [the] light duty restrictions." Def.'s Ex. 46. Plaintiff was also informed that she could submit a physicians' statement to the effect that she was physically able to resume all her duties. Resignation was mentioned as a third possibility. The letter also indicated that plaintiff had been carried on AWOL status for all days not worked since June 6, 1990. *See* Def.'s Ex. 46.

39. On September 10, 1990, Mr. LeGar received a medical report form plaintiff's doctor. The report did not contain the neces-

sary items delineated in Mr. LeGar's letter of August 24, 1990. *See* Def.'s Ex. 44.

40. By letter dated September 12, 1990, Mr. LeGar informed plaintiff of the deficiencies in her doctor's submission of September 10, 1990, which was inadequate for failure to provide the anticipated duration of the restrictions. Plaintiff was given an opportunity to file a new light duty request. *See* Def.'s Ex. 49.

41. On October 15, 1990, plaintiff submitted a note from her doctor, dated October 2, 1990, that set forth her restrictions, but failed to state their duration. She was advised to resubmit a note indicating the duration. *See* Def.'s Exs. 42C & 50.

42. On October 19, 1990, plaintiff submitted a second note from her doctor, again dated October 2, 1990, that set forth her restrictions. The note also contained a line titled "Return to light duty" that was checked, and the words "for 6 wks." were written on the line. Def.'s Ex. 51. Though this apparently specified the duration of the restriction, it was not so interpreted by Mr. LeGar, who told plaintiff to resubmit a note indicating the total duration, i.e., when the restriction would end. *See id.* 41 & 51.

43. Defendant made no further submissions.

44. On November 9, 1990, plaintiff was issued a Notice of Removal (the "NOR"), indicating that she would be discharged from the Postal Service thirty days after receipt of the letter. Two grounds for her removal from the Postal Service were given: 1) failure to meet the physical requirements of her position, and 2) failure to follow instructions. The NOR cited to her being AWOL from her duties at Southeastern during the time period after June 6, 1990, and her failure to provide adequate medical documentation in light of the OWCP's denial of her claim for workers' compensation benefits. The NOR also stated that plaintiff was ineligible for permanent light duty because she had less than five years of service. *See* Def.'s Ex. 41.

45. On November 13, 1990, plaintiff's doctor informed her that she should not return to work until further diagnosis by him. She

was instructed to return in three weeks for follow-up. *See* Def.'s Ex. 52.

46. On November 15, 1990, plaintiff again met with an EEO counselor to discuss the NOR. This complaint was combined with the complaint of July 3, 1990. *See* Def.'s Ex. 43.

47. On December 4, 1990, plaintiff filed a grievance with the NALC on the matter of her imminent removal. *See* Def.'s Ex. 53.

48. On that same day, plaintiff's doctor dictated a report on plaintiff's follow-up visit, indicating that she would be restricted as to standing, squatting, driving, and stair use for at least another six months. *See* Def.'s Ex. 54A. As of December 4, 1990, therefore, plaintiff still did not meet the physical requirements of the PTF city letter carrier position. *See* Def.'s Ex. 11.

49. On December 10, 1990, plaintiff was terminated from the Postal Service.

50. On April 16, 1991, plaintiff had her final interview with the EEO counselor, at which time she was advised by the counselor that she could file a formal complaint within fifteen days. *See* Def.'s Ex. 43. She filed a complaint that same day, claiming that she was discriminated against on the basis of race and physical handicap in her termination and in the refusal to assign her light duty work in June of 1990. *See* Def.'s Exs. 55 & 56.

51. On April 17, 1991, the letter of warning of April 10, 1990, was upheld by a neutral arbitrator, appointed under the collective bargaining agreement (the "CBA") in place between the NALC and the Postal Service, who found that "[t]here was just cause for the issuance of the letter of warning." Def.'s Ex. 32.

52. In a note dated October 16, 1991, plaintiff's doctor indicated that she could engage in no squatting, kneeling, or heavy pushing or pulling, that she was limited as to her climbing and use of stairs, and that she could return to light duty. *See* Def.'s Ex. 54B.

53. On October 21, 1991, plaintiff's appeal of her OWCP claim for the December 29, 1989, injury was denied. *See* Def.'s Ex. 57.

54. On October 29, 1991, plaintiff's grievance of her removal was denied by a neutral arbitrator, appointed under the CBA in place between the NALC and the Postal Service, as being untimely filed, plaintiff having failed to file her grievance within fourteen days of the issuance of the NOR. *See* Def.'s Ex. 53. The arbitrator's award went on to state, in *dicta,* that there was just cause for removal due to the plaintiff's failure to respond adequately to requests for medical information and failure to report to her ordered assignments. *See id.*

55. On December 11, 1991, the Postal Service denied plaintiff's discrimination complaint. *See* Def.'s Ex. 58.

56. On May 28, 1992, a hearing on plaintiff's complaint was held before an Administrative Law Judge ("ALJ"). The ALJ recommended that the claims be denied.

57. On August 19, 1992, the ALJ's recommendation was adopted as the final agency decision. *See* Def.'s Ex. 59.

58. On September 18, 1992, the instant claim was filed.

## II. DISCUSSION [2]

Plaintiff's claims of discrimination and retaliation assert various federal causes of action. Title VII of the Civil Rights Act of 1964 prohibits discrimination by the United States Postal Service against a postal employee on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a). It also prohibits the Postal Service from retaliating against an employee who files a complaint of discrimination with the EEO of the Postal Service. *See* 42 U.S.C. § 2000e–3; *Hale v. Marsh,* 808 F.2d 616, 619 (7th Cir.1986); *Ayon v. Sampson,* 547 F.2d 446, 449–50 (9th Cir.1976). Discrimination on the basis of handicap is prohibited by the Rehabilitation Act of 1973. *See* 29 U.S.C. §§ 791, 794. The Court will address the claims of racial discrimination, retaliation,

---

**2.** Any additional facts set forth in this section are deemed to be incorporated in the Findings of Fact. *See* Fed.R.Civ.P. 52(a).

and physical handicap discrimination *seriatim.*

## A. *Racial Discrimination Claim*

■ Plaintiff argues that she was the victim of disparate treatment by her employer due to her race.[3] "A disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII." *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 347 (3d Cir.1990). The burden of proof in such a case depends on whether the case is a "pretext" case or a "mixed-motives" case. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 246–48, 109 S.Ct. 1775, 1788–90, 104 L.Ed.2d 268 (1989) (plurality opinion); *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 468 (3d Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993). In a pretext case, the plaintiff's theory is that the "discriminatory motive was the *sole* cause of the employment action," *id.* at 472, with the burden of proof resting on the plaintiff throughout the case, *see St. Mary's Honor Ctr. v. Hicks,* — U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993).[4] In contrast, a plaintiff in a mixed-motives case bears the initial burden of establishing that an impermissible motive was *a* motivating or significant factor in the employment decision. *See Griffiths,* 988 F.2d at 469. If she succeeds, the burden of proof then shifts to the defendant to prove that the adverse decision would have been made regardless of the impermissible motive. *See id.; Ezold v. Wolf, Block, Schorr & Solis–Cohen,* 983 F.2d 509, 522 (3d Cir.1992),

*cert. denied,* — U.S. ——, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993).[5]

Plaintiff contends that her claim is of the mixed-motives type, since she contends that there is evidence that directly establishes that Mr. LeGar, the postmaster at the Pottstown P.O., was biased towards black employees. *See, e.g.,* Pl.'s Mem. in Reply to Def.'s Mot. for Summ.J. at 2 (arguing that "the real model for this complaint can be seen in cases like *Price Waterhouse v. Hopkins* "). "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Brown v. East Miss. Elec. Power Ass'n,* 989 F.2d 858, 861 (5th Cir.1993); *see, e.g., Maxfield v. Sinclair Int'l,* 766 F.2d 788, 791 (3d Cir.1985) (noting that "[d]irect evidence would include statements by the employer to the employee that s/he was being fired because of" an impermissible reason), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986). For instance, in *EEOC v. Alton Packaging Corp.,* 901 F.2d 920 (11th Cir.1990), a plant manager responsible for promotion decisions stated that "if it was his company, he wouldn't hire any black people." *Id.* at 922. This statement by a decisionmaker was held by the court to be direct evidence of discriminatory animus sufficient to carry plaintiff's burden. *See id.* at 924. As the Third Circuit Court of Appeals noted in *Griffiths,* "when a plaintiff has direct evidence of discrimination, the case is likely to be a mixed motives case for the employer will offer a different but legitimate basis for the adverse employment decision." *Griffiths,* 988 F.2d at 470 n. 12. The Court will therefore accept plaintiff's characterization of her claim and will consider plaintiff's claim as a mixed-motives case.

**3.** Plaintiff's complaint also alleged a disparate impact claim under Title VII, maintaining that the defendant's classification of injuries as being "on-the-job" or "off-the-job" had an arbitrary effect on the treatment of injured employees. *See* Pl.'s Complaint ¶ 59. Since no evidence or argument on this claim was introduced at trial, the claim is deemed abandoned.

**4.** In *Miller v. CIGNA Corp.,* No. 93–1773, 1994 WL 283269 (3d Cir. June 28, 1994), the Third Circuit recognized that use of the term "sole cause" in *Griffiths* may be somewhat "cryptic," requiring plaintiff to bear a greater burden than necessary in a pretext case. *See id.* at *10–*11. To the extent that this is a mixed-motives case,

the Court need not determine what effect any possible tension between *Griffiths* and *Miller* has on the instant case. In any event, as discussed further in footnote eight, *infra, Miller* would not change the result in this case.

**5.** The Civil Rights Act of 1991, which would permit relief where impermissible motives animate an employment decision that would have been taken regardless, *see* 42 U.S.C.A. § 2000e–5(g)(2)(B) (West Supp.1993), is not applicable to plaintiff's claim. *See Landgraf v. USI Film Prods.,* — U.S. ——, ——, 114 S.Ct. 1483, 1497–1501, 128 L.Ed.2d 229 (1994) (discussing the presumption against statutory retroactivity).

■ At trial, plaintiff sought to establish the alleged discriminatory animus held by Mr. LeGar through a number of witnesses. The testimony of most of the witnesses, however, does not provide direct evidence of discriminatory bias. For example, Guy Carter, who was a window clerk at the Pottstown P.O. during the time plaintiff was an employee, testified that disciplinary rules were enforced more harshly against black employees than against white employees. And Bruce Griffith, a union representative during the pertinent time period, echoed Mr. Carter's testimony, noting that the number of complaints to the EEO had increased dramatically since Mr. LeGar began his term as postmaster. Evidence of this sort, however, is typical circumstantial evidence, syllogistic in kind, which requires an inferential leap to reach the ultimate conclusion (i.e., black employees are treated more harshly than white employees; plaintiff is a black employee; therefore, plaintiff was treated more harshly than white employees). While circumstantial evidence can, under some circumstances, establish discriminatory animus in a mixed-motive case, the anecdotal evidence proffered by Messrs. Carter and Griffith in this case, though perhaps probative of disparate treatment, does not rise to the level of proof that is needed. "At a bare minimum, a plaintiff ... will have to adduce circumstantial evidence 'of conduct or statements by persons involved in the decisionmaking process that may be viewed as *directly reflecting the alleged discriminatory attitude.*'" *Griffiths,* 988 F.2d at 470 (emphasis added) (quoting *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir.1992)). At best, the events described by Messrs. Carter and Griffith, with the benefit of some inferences, are indirect evidence of a discriminatory attitude, insufficient to establish by the preponderance of the evidence that race was *a* motivating factor and, therefore, to cause the burden of proof to be shifted to the defendant.

■ Plaintiff's only evidence that was akin to direct evidence, indeed, plaintiff's "smoking gun", consisted of the testimony of Cynthia Bearden, an employee at the Pottstown P.O. at the time that Mr. LeGar became the postmaster. Ms. Bearden testified that Mr. LeGar called her into his office shortly after he became postmaster. When she entered the office, she saw that Mr. LeGar had a number of personnel folders on his desk, all of which appeared to be of black employees. He informed her that he wanted to terminate inefficient employees, that he believed that black workers were bad, and that he wanted to make Pottstown an all-white office.[6] Ms. Bearden, who is black, testified that, due to her fair complexion, she had previously been mistaken as being white. Based on this experience, she theorized that Mr. LeGar believed she was white when he made these comments. After leaving Mr. LeGar's office, Ms. Bearden claimed to have overheard a supervisor inform Mr. LeGar that Ms. Bearden was in fact black. Ms. Bearden also claimed to have overheard Mr. LeGar advising an insurance salesman with whom she had spoken concerning her insurance needs that the salesman should not insure her, since, in Mr. LeGar's opinion, "niggers" always let their policies lapse. Evidence of the type adduced by Ms. Bearden, i.e., derogatory remarks made by a person with decision-making authority, can provide a sufficient basis to find that a plaintiff has met her burden of proof. *See, e.g., EEOC v. Beverage Canners, Inc.,* 897 F.2d 1067, 1068, 1071–72 (11th Cir.1990) (finding that "flagrant, revolting, and insulting racially derogatory remarks" made towards black employees by a plant manager and supervisor were sufficient to show direct evidence of discrimination); *Weatherspoon v. Andrews & Co.,* 33 Empl. Prac.Dec. (CCH) ¶ 34,038, at 31,903, 1983 WL 577 (D.Colo.1983) (finding direct evidence of racially motivated discharge where plaintiff introduced evidence that her immediate supervisor called her a "'Goddamn black nigger—just like all the other goddamn black niggers—not worth a damn'").

Ms. Bearden's testimony concerning Mr. LeGar's statements, however, was flatly denied by Mr. LeGar on direct testimony. Mr. LeGar claimed he had no conversation with

---

6. At the time, the Pottstown P.O. had approximately fifty employees, of whom approximately ten were black.

Ms. Bearden concerning the termination of employees. In addition to the denial by Mr. LeGar, defendant established that Ms. Bearden was plaintiff's first cousin, *see* 3A John H. Wigmore, *Evidence* § 949, at 784 (Chadbourn rev. 1970) (enumerating family relationship as one of the "*commoner sorts of circumstances*" from which bias may be inferred), that she was disciplined at two later assignments within the Postal Service, in Valley Forge and in Royersford, for stock shortages and attendance, and that she resigned while a NOR was pending at the Royersford Post Office. *See United States v. Abel,* 469 U.S. 45, 50–51, 105 S.Ct. 465, 468–69, 83 L.Ed.2d 450 (1984). In rebuttal to this implicit assertion of recent fabrication, the plaintiff offered the testimony of Mr. Carter, who testified that Ms. Bearden related the alleged incident in Mr. LeGar's office to him some time shortly after the incident occurred. In turn, the Postal Service impeached Mr. Carter by establishing that Mr. Carter had also been disciplined by the Postal Service at various times for work-related incidents.

Sitting as the trier of fact, the Court is called upon to assess the credibility of witnesses. *See* Fed.R.Civ.P. 52(a); *Anderson v. City of Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). The testimony of Ms. Bearden and Mr. LeGar stand in stark contrast, with the latter challenging *in toto* the former's recollection. In addition to the statements themselves, other factors enter into the Court's calculus of credibility. *See Miller v. Mercy Hosp., Inc.,* 720 F.2d 356, 365 (4th Cir.1983) (noting that a credibility assessment must be made in light of the overall testimony in the case), *cert. denied,* 470 U.S. 1083, 105 S.Ct. 1841, 85 L.Ed.2d 141 (1985). For instance, there is the relationship between Ms. Bearden and the plaintiff, as well as the difficulties Ms. Bearden has had with the United States Postal Service since her employment at the Pottstown P.O. The key assertion in plaintiff's theory of liability, that the Postmaster

for no apparent rhyme or reason had called Ms. Bearden into his office to discuss the performance of black employees, does not have the ring of truth.[7] Rehabilitating Ms. Bearden's testimony is the testimony of Mr. Carter, which helps rebut any implication of *recent fabrication, but which suffers from bias itself.* Mr. LeGar's testimony is also subject to a charge of bias, given the personal interest he has in not being labeled a racist. *See* 27 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure: Evidence* § 6095 (1990). The circumstantial evidence in the case is conflicted, with Messrs. Carter and Griffin claiming disparate treatment by Mr. LeGar of black and white workers, and Mr. John Mauger, a postal employee at the Pottstown P.O. who was also a union representative and was called as a witness by the *plaintiff,* testifying that there was no difference in the treatment of white and black employees by Mr. LeGar.

On the basis of the testimony offered, as well as the demeanor of the various witnesses, the Court finds that Ms. Bearden's and Mr. LeGar's versions of the facts stand in equipoise. The Court does not find Ms. Bearden credible, given her demeanor on the stand, her relationship to the plaintiff, and the axe she has to grind with the Postal Service. Neither is the Court entirely persuaded by Mr. LeGar's testimony. Both have a motive to embellish the truth, Mr. LeGar attempting to preserve his reputation, Ms. Bearden helping her cousin in her law suit and getting even with an employer that drove her to resign. Because neither has convinced this Court that the testimony given is credible and accurate, the Court will not credit either one's version of the facts.

Absent the testimony of Ms. Bearden, plaintiff has no evidence of intentional discrimination on the part of Mr. LeGar. A decrease in the number of blacks employed at the Pottstown P.O., an increase in the number of complaints to the EEO, selective enforcement of work rules, all of these are circumstantial evidence which, as already

---

7. Ms. Bearden explained that Mr. LeGar called her into his office and took her into his confidence because she was a "training supervisor." However, Mr. LeGar had no recollection that Ms. Bearden ever held such a post, and there is apparently no record in Ms. Bearden's personnel file of such a position. Ms. Bearden claimed that all references to the position were surreptitiously removed from her personnel file. The Court does not find this explanation credible.

stated, are insufficient to establish discriminatory animus in a mixed-motive case. *See Griffiths,* 988 F.2d at 470. Given that the essential factual inquiry in any disparate treatment case is whether "the defendant intentionally discriminated against the plaintiff," *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), with the plaintiff bearing the burden of establishing such intentional discrimination by a preponderance of the evidence, *see St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2749, the Court finds that the plaintiff has failed to meet her burden, under the mixed-motive type of analysis, of showing, by a preponderance of the evidence, that discriminatory intent was a motivating factor.

■ Even assuming that plaintiff had met her burden, the defendant, in response, has successfully shown by the preponderance of the evidence that it would have taken the same actions notwithstanding any bias on the part of Mr. LeGar. The establishment of this affirmative defense absolves defendant of any liability. *See Price Waterhouse,* 490 U.S. at 242–45, 109 S.Ct. at 1786–88; *Griffiths,* 988 F.2d at 469. In this case, defendant successfully explained every incident of racial discrimination suggested by the plaintiff. Plaintiff claimed that she was denied her step increases due to racial discrimination. Defendant countered that the step increases were deferred pursuant to the ELM due to the number of days she had spent on LWOP status prior to the consideration of the step increase. Plaintiff claimed she was not given the opportunity to perform light duty work at the Pottstown P.O., and that she was assigned to Southeastern to perform light duty work even though no one had theretofore been assigned to Southeastern. Defendant countered that plaintiff was given limited duty work at Pottstown while her workers' compensation claim was pending, and that she was offered the opportunity to request light duty work once her claim was denied. Defendant also argued that the assignment to Southeastern was done only after plaintiff complained that she was not able to do the limited duty assignment that she had been given on June 4, 1990, due to the seating available in the Pottstown P.O. As

to plaintiff's eventual discharge, the defendant argued that her extended absence from work due to her physical condition, coupled with her failure to produce the necessary medical documentation requested by Mr. LeGar, were the grounds for her termination. To further rebut the charge of discrimination, defendant noted that Mr. LeGar was the postmaster who had hired plaintiff, and that he had afforded her the use of a Postal Service vehicle for commuting to Southeastern.

The Court, as trier of fact, finds that defendant has carried its burden, and that plaintiff has failed to carry hers. *See St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2747; *Aikens,* 460 U.S. at 714–16, 103 S.Ct. at 1481–82; *Griffiths,* 988 F.2d at 469. Though the circumstantial evidence does raise some question of bias on the part of the management at the Pottstown P.O., any possible inference was refuted by the evidence of plaintiff's physical incapacity and poor work attendance. Plaintiff was considered AWOL from her assignment for an extended period of time in 1990. She received a letter of warning on April 10, 1990, for "failure to meet the availability/dependability requirements of [her] position." *See* Def.'s Ex. 31. This letter was upheld by an arbitrator, who found just cause for its issuance. *See* Def.'s Ex. 32. Though plaintiff complains that the next level of discipline after the letter of warning should have been a suspension, rather than the NOR that she received, defendant correctly notes that the suspension of an AWOL employee would do little good. Plaintiff cannot complain of a lack of progressiveness in discipline if by her very actions she has rendered resort to progressive discipline futile. The cases of white employees who were suspended, some more than once, before they received a NOR are simply inapposite. The plaintiff was unable to meet the physical requirements of her position as a PTF letter carrier and she did not produce the medical documentation necessary for a light duty request. The Court finds that plaintiff has failed to establish by a preponderance of the evidence that her discharge from the Postal Service, and her treatment during her tenure, was the product of inten-

tional discrimination, and also finds that the defendant has established by a preponderance of the evidence that it would have dismissed plaintiff notwithstanding any racial animus on the part of Mr. LeGar.[8] *See Price Waterhouse,* 490 U.S. at 242–45, 109 S.Ct. at 1786–88; *Griffiths,* 988 F.2d at 469.

### B. *Retaliation Claim*

■ Plaintiff claims that she was discharged in retaliation for her meeting with an EEO counselor to discuss her allegations of racial discrimination. Defendant argues that this claim is precluded since plaintiff has failed to exhaust her administrative remedies due to the failure to include retaliation in the claims that she brought to the EEO counselor. *See* Def.'s Exs. 43 & 55; *Brown v. General Servs. Admin.,* 425 U.S. 820, 832–33, 96 S.Ct. 1961, 1967–68, 48 L.Ed.2d 402 (1976); *Hornsby v. United States Postal Serv.,* 787 F.2d 87, 90 (3d Cir.1986) ("A complaint does not state a claim upon which relief may be granted unless it asserts the satisfaction of the precondition to suit specified by Title VII: prior submission of the claim to the EEOC. . . ."). A plaintiff may not normally litigate allegations that were not the subject of administrative investigation and fact-finding. *See, e.g., Mackay v. United States Postal Serv.,* 607 F.Supp. 271, 276 (E.D.Pa.1985) (noting that administrative exhaustion demands final administrative action or the opportunity for the same). However, an action can be pursued for claims that are within the scope of a reasonable investigation by the EEO, even if the investigation is not conducted. *See Hicks v. ABT Assocs., Inc.,* 572 F.2d 960, 966–67 (3d Cir.1978) (holding that claims within the scope of a reasonable EEOC investigation are adjudicable); *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 398–99 (3d Cir.1976) (same), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977).

In *Hicks v. ABT Associates, Inc.,* the Third Circuit held that "the scope of a resulting private civil action in the district court is 'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Hicks,* 572 F.2d at 966 (quoting *Ostapowicz,* 541 F.2d at 398–99). The plaintiff in that case had made a claim of race discrimination to the EEOC, and sought to press a claim of sex discrimination in his lawsuit. The Third Circuit held that, at the summary judgment stage, it was not able to determine whether a claim of sex discrimination was reasonably within the scope of a proper EEOC investigation, since the plaintiff was never interviewed by the EEOC. *See id.* at 966–67. The Court also held that the lower court would have to determine that the "sex discrimination claims which would have been uncovered were reasonably within the scope of the charge filed with the EEOC." *See id.* at 967.

---

8. Under *Price Waterhouse* and *Griffiths,* a plaintiff who is unsuccessful in pressing a mixed-motive claim can still make a claim of pretext. *See Price Waterhouse,* 490 U.S. at 247 n. 12, 109 S.Ct. at 1789 n. 12; *Griffiths,* 988 F.2d at 470 n. 13. At this point in the proceedings, the now-familiar *McDonnell Douglas–Burdine* framework for establishing a Title VII claim via indirect evidence is inapplicable. Whether or not the plaintiff has actually established a prima facie case under *McDonnell Douglas* is irrelevant, since any presumption that such a prima facie showing would have established "drop[ped] out of the picture" after defendant came forward with a legitimate, nondiscriminatory reason for its actions. *St. Mary's,* — U.S. at ——, 113 S.Ct. at 2749; *Seman v. Coplay Cement Co.,* 26 F.3d 428, 437–38 (3d Cir.1994); *see also United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant."). Having found that the defendant successfully established that it would have dismissed plaintiff notwithstanding any discriminatory bias, it follows *a fortiori* that plaintiff failed to show that the alleged discriminatory bias was the *sole* cause of her dismissal, *see Griffiths,* 988 F.2d at 472, and thus any attempt to establish a pretext case must also fail. Even under the Third Circuit's recent elaboration on *Price Waterhouse* and *Griffiths* in *Miller v. CIGNA Corp.,* No. 93–1773, 1994 WL 283269 (3d Cir. June 28, 1994), which casts doubt on the requirement of showing sole causation, *see id.* at *7, *10–*11, the defendant is still entitled to judgment. For the reasons already stated, the plaintiff has failed to show by a preponderance of the evidence that racial animus "played a role in the employer's decisionmaking process and . . . was a determinative factor in the outcome of that process." *Id.* at *13.

Reviewing the EEO complaint filed by plaintiff, the Court finds no basis for concluding that a retaliation charge is within the scope of the complaint. Plaintiff stated that she was denied work and terminated on the basis of her "on the job knee injury," and pointed to possible "race, sex and/or handicap" discrimination. Def.'s Ex. 55. There is nothing in the complaint that even suggests a retaliatory discharge, which is linked to engagement in protected activity, rather than discrimination based on an immutable characteristic. *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989), *cert. denied*, 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). By contrast, the activity alleged by the plaintiff in *Hicks v. ABT Associates, Inc.*, could have given rise to both sex and race discrimination. *See Hicks*, 572 F.2d at 967 (noting that "there is a close nexus between the facts supporting the claims of race and sex discrimination").

Also noteworthy is the date the complaint was filed, April 16, 1991, which was over five months after plaintiff's termination. Notwithstanding the amount of time that passed between the two events, no mention is made in the complaint of any activity that can be construed as a retaliatory discharge. And plaintiff was on notice that Mr. LeGar had been contacted prior to her termination, since the EEO counselor reported such contact in his resolution of the plaintiff's informal complaint. *See* Def.'s Ex. 43. The Court concludes that a claim of retaliatory discharge is not within the scope of the EEO complaint filed by the plaintiff.

Furthermore, even if the Court were to find that the claim was justiciable, plaintiff's claim would still be denied. "In order to succeed on a claim of discriminatory retaliation, a plaintiff must demonstrate that: 1) she engaged in conduct protected by Title VII; 2) the employer took adverse action against her; and 3) a causal link exists between her protected conduct and the employer's adverse action." *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 201 (3d Cir.1994) (internal quotation marks omitted). As to

the first two elements, plaintiff has established a prima facie case. Her meeting with an EEO counselor was protected activity, and she was terminated from her employment. However, it is on the causation element that plaintiff's claim fails. Plaintiff based her claim on the relatively short period of time between her engaging in protected activity and the adverse employment action—she met with an EEO counselor in July of 1990 and she was given a NOR in November of 1990. Temporal proximity can give rise to an inference of causation. *See, e.g., Jalil*, 873 F.2d at 708 (finding evidence of a prima facie case of retaliatory discharge where plaintiff was discharged two days after filing EEOC claim); *Weiss v. Parker Hannifan Corp.*, 747 F.Supp. 1118, 1129 (D.N.J. 1990) (finding causal link where discharge occurred three days after plaintiff engaged in protected activity). Here, however, there was a gap of approximately four months between the activity and the termination. And, more importantly, the defendant has come forward with a legitimate reason for the discharge, i.e., plaintiff's continuing inability to meet the physical requirements of her job and to report to her assigned work. As discussed *supra*, the defendant has demonstrated that plaintiff was discharged for legitimate business reasons. Therefore, assuming that the claim of retaliatory discharge was properly raised before the EEO and is properly before this Court, the Court finds that the plaintiff has failed to show by a preponderance of the evidence that her filing of a claim with the EEO caused her subsequent discharge by the defendant.

## C. *Handicap Discrimination*

Plaintiff claims that she was the victim of impermissible handicap discrimination due to her knee injury. Under the Rehabilitation Act of 1973, an "otherwise qualified individual" who is handicapped cannot be discriminated against on the basis of that handicap by a federal employer. *See* 29 U.S.C. §§ 791, 794(a); *Mackay*, 607 F.Supp. at 274–78.[9] In order to establish a claim under the

---

9. Plaintiff brings this claim under § 794, which applies to any "program or activity conducted by ... the United States Postal Service." *See* 29

U.S.C. § 794(a); Pl.'s Complaint ¶¶ 63–64. Unlike the language of § 791, which specifically applies to federal employees, § 794 does not

Rehabilitation Act, the plaintiff must "prove (1) that [s]he is a 'handicapped individual' under the Act, (2) that [s]he is 'otherwise qualified' for the position sought, (3) that [s]he was excluded from [her] position ... solely by reason of [her] handicap, and (4) that the program or activity in question receives federal financial assistance [or is a federal employer]." *Strathie v. Department of Transp.*, 716 F.2d 227, 230 (3d Cir.1983).

■ The Court's inquiry focuses on the "otherwise qualified" requirement. An otherwise qualified handicapped individual is "an individual with handicaps who, with or without reasonable accommodation, can perform the essential functions of *the position in question* without endangering the health and safety of the individual or others." 29 C.F.R. § 1614.203(a)(6) (1993) (emphasis added); *see Southeastern Community College v. Davis,* 442 U.S. 397, 406, 412–13, 99 S.Ct. 2361, 2367, 2370–71, 60 L.Ed.2d 980 (1979). "[A]n accommodation that eliminates an essential function of [a] job is not reasonable." *Hall v. United States Postal Serv.*, 857 F.2d 1073, 1078 (6th Cir.1988); *see also School Bd. of Nassau County v. Arline*, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987) ("Accommodation is not reasonable if it either imposes 'undue financial and administrative burdens' on [an employer] or requires 'a fundamental alteration in the nature of the program.' ") (citations omitted). The burden is on the plaintiff to make the initial showing that she is otherwise qualified. *See Taub v. Frank*, 957 F.2d 8, 10 (1st Cir. 1992); *Jasany v. United States Postal Serv.*, 755 F.2d 1244, 1249–50 (6th Cir.1985); *Pushkin v. Regents of Univ. of Colo.*, 658 F.2d 1372, 1385 (10th Cir.1981).

In this case, plaintiff has failed to show that she is otherwise qualified for her position as a PTF city letter carrier. Essential functions of the letter carrier position included sorting mail for approximately two hours

per day and carrying and delivering mail approximately six hours per day while carrying a mail satchel weighing up to thirty-five pounds. *See* Def.'s Ex. 11. The evidence showed, however, that plaintiff was unable to carry mail given her medical restrictions and was unable to sort mail due to physical discomfort. When defendant made attempts to accommodate plaintiff's condition by giving her light duty work at the Pottstown P.O. and at Southeastern, plaintiff was still unable to complete the duties assigned to her and failed to report to work. *Cf. Carr v. Reno*, 23 F.3d 525, 529–30 (D.C.Cir.1994) ("We agree with the proposition that an essential function of any government job is an ability to appear for work (whether in the workplace or, in the unusual case, at home)...."). It is difficult to conceive of a reasonable accommodation that can be made for a letter carrier who cannot sort or carry letters. Plaintiff did not indicate any possible reasonable accommodation defendant could have made, other than unspecified light duty work that allegedly could have been done by the plaintiff. Such is not the test under the Rehabilitation Act. An employer is "not required to find another job for an employee who is not qualified for the job he or she is doing." *Arline*, 480 U.S. at 289, 107 S.Ct. at 1131; *see, e.g., Montgomery v. Frank*, 796 F.Supp. 1062, 1069 (E.D.Mich.1992). At the same time, the employer cannot "deny an employee alternative employment opportunities reasonably available under the employer's existing policies." *Id.; see Davis v. United States Postal Serv.*, 675 F.Supp. 225, 235 (M.D.Pa. 1987). Defendant offered plaintiff various light duty assignments in Pottstown and in Southeastern, going so far as to provide transportation to the Southeastern office. There is no indication that plaintiff was not given an opportunity to perform work other than carrying mail. Plaintiff has failed to meet her burden of showing that she was

indicate that it is applicable to federal employment. *Compare Smith v. United States Postal Serv.*, 742 F.2d 257, 260 (6th Cir.1984) (§ 794 applies to government employees) *with Boyd v. United States Postal Serv.*, 752 F.2d 410, 413 (9th Cir.1985) (finding that § 791 is the exclusive remedy for discrimination on the basis of handicap by the Postal Service). Since the Court finds

that plaintiff has not met her burden of establishing that she is "otherwise qualified," a finding that is essential to either section, the Court need not reach the issue of whether § 791 provides the exclusive remedy for a postal employee complaining of handicap discrimination. *See Taylor v. Garrett*, 820 F.Supp. 933, 935 n. 3 (E.D.Pa. 1993).

otherwise qualified for her position as a PTF city letter carrier.[10]

## III. CONCLUSIONS OF LAW

1. Plaintiff has failed to show by a preponderance of the evidence that she was discriminated against by defendant on the basis of her race. *See* 42 U.S.C. § 2000e–16(a).

2. Plaintiff has failed to exhaust her administrative remedies on her claim of retaliatory discharge. *See Hornsby,* 787 F.2d at 90.

3. Assuming administrative exhaustion, plaintiff has failed to show a causal link between her engagement in protected activities and the adverse employment actions taken against her. *See id.* § 2000e–3.

4. Plaintiff has not established that she was otherwise qualified for her position as a PTF city letter carrier. *See* 29 U.S.C. §§ 791, 794(a); 29 C.F.R. § 1614.203(a)(6) (1993).

Judgment in defendant's favor shall be entered.

AND IT IS SO ORDERED.

---

**10.** Given the discussion *supra* concerning the reasons behind defendant's dismissal of plaintiff (i.e., failure to follow instructions), plaintiff has also failed to establish that she "was excluded from [her] position *solely* by reason of [her] handicap." *Strathie,* 716 F.2d at 230 (emphasis added).