Lawrence C. MOSS, Plaintiff,

v.

**KOOLVENT ALUMINUM PRODUCTS, INC., Defendant.**

Arthur W. BASNIGHT, III, Plaintiff,

v.

**KOOLVENT ALUMINUM PRODUCTS, INC., Defendant.**

Civil Action Nos. 94–1029, 94–1050.

United States District Court, W.D. Pennsylvania.

April 15, 1997.

658

Laura A. Candris, Meyer, Unkovic & Scott, L.L.P., Pittsburgh, PA, William E. Adams, Eckert Seamans Cherin & Mellott, Pittsburgh, PA, for Defendant.

Sylvia Denys, Pittsburgh, PA, for Plaintiffs.

## OPINION

COHILL, Senior District Judge.

Plaintiffs Lawrence C. Moss and Arthur W. Basnight, III filed this action against their former employer, defendant KoolVent Aluminum Products, Inc. ("KoolVent"), asserting claims of racial discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 105 Stat. 1074–1076 (Nov. 21, 1991), 42 U.S.C.2000e–2, *et seq.* ("Title VII"), and 42 U.S.C. § 1981 ("§ 1981"). Plaintiffs also claim retaliatory discharge in violation of 42 U.S.C. § 2000e–3.

Specifically, plaintiff Moss claims that he was denied promotions in 1993 and 1994, and that he was ultimately terminated on May 20, 1994, because of his race and because he filed complaints of discrimination with the NAACP, with the Equal Opportunity Employment Commission ("EEOC"), and with the Pittsburgh Human Relations Commission ("PHRC"). The promotions he alleges he was denied were to the position of Lead Center Manager at the Pittsburgh, Orlando, Monroeville, and Greensburg Lead Centers.[1]

---

**1.** By Order dated October 19, 1994, this Court (per Bloch, J.) dismissed, with prejudice, Moss'

Plaintiff Basnight contends that he was denied promotion to a supervisory position in late 1993, and that he was terminated on April 20, 1994 because of his race and because he filed a charge of discrimination with the EEOC. The supervisory position he sought was supervisor for the Monroeville Roofing Lead Center.[2] Although plaintiff's Pretrial Statement asserts a claim that he was also passed over for promotion to the acting supervisor position at the Orlando Lead Center, he presented no evidence on this claim at trial and we do not address it here.

A bench trial was held before the Honorable Maurice B. Cohill, Jr., Senior District Judge, on February 10–14, 18 and 19, 1997. Plaintiffs were represented by Sylvia Denys, Esquire. Defendant was represented by Laura A. Candris, Esquire and William E. Adams, Esquire. The Court heard testimony from the following witnesses: Gary Yarber, Timothy Flanigan, Harvey Adams, Jr., plaintiff Lawrence Moss, Larry Krempasky, Gary Iskra, Delmetris Peterkin, Jon Rebel, Chuck Klinzing, plaintiff Arthur Basnight, III, Dr. Lloyd Bell, Timothy McFarlane, Michael Madden, John Stermon, Dr. Christine Martone, Kevin Kizer, Richard Vrana, Matthew Meyers, Gabrielle Frye, Michael Zabec (by videotaped deposition), and George Harvey.

This Court has jurisdiction pursuant to 28 United States Code § 1331. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, we now issue the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

Plaintiffs are African–American men who reside in Pittsburgh, Pennsylvania. Defendant KoolVent was a corporation with its principal place of business in Allegheny County, Pennsylvania. In 1996, KoolVent and other corporations merged to form American Home Improvement Products, Inc. At all relevant times, KoolVent employed more than 15 persons during each workweek of each calendar year and was engaged in interstate commerce as an industry affecting commerce. In December of 1994 KoolVent employed 412 persons. The company had an Equal Employment Opportunity and Sexual Harassment Policy in place, which included an internal procedure for reporting alleged discrimination.

## KoolVent's Structure and Telemarketing Operation

KoolVent manufactured and installed home improvement products, including replacement windows and doors, vinyl siding, and roofing systems. Its products were marketed through television advertising and telemarketing. KoolVent operated "lead centers," which are telemarketing centers that generate appointments ("leads") that are followed up by company sales personnel.

Telemarketers ("TSRs") generated leads by cold-calling homeowners and by contacting "preferred" customers, such as those who responded to KoolVent's television advertisements. KoolVent's TSRs received training and were expected to work from a script. Performance was measured by their lead writing ratios ("LWR") and the percentage of leads that resulted in demonstrations ("demos") or sales. The LWR is determined by dividing the number of leads written by a TSR by the number of hours a TSR spent on

---

claims under 42 U.S.C. § 1981 set forth in Counts IV, V, VI and VII of the Second Amended Complaint to the extent that they are based upon events occurring prior to June 17, 1992, because such claims are barred by the applicable two-year statute of limitations. Additionally, Moss' claims under Title VII set forth in Counts I, II, III, V, VI and VII of the Second Amended Complaint were dismissed with prejudice to the extent that they are based on conduct of defendant which is not the basis of the charges of discrimination at Nos. 172940526 and 17H940117.

2. By Order dated October 19, 1994, this Court dismissed, with prejudice, Counts I, II, III, and

IV of Basnight's Amended Complaint. The Court also dismissed Basnight's claims under 42 U.S.C. § 1981 with prejudice to the extent that they are based upon events occurring prior to June 21, 1992, because such claims are barred by the applicable two-year statute of limitations. Additionally, Basnight's claims under Title VII set forth in Counts VIII, IX and X of his Amended Complaint were dismissed with prejudice to the extent that they are based on conduct of defendant which is not the basis of the charges of discrimination at Nos. 172940531 and 172941265.

the system writing leads. TSRs following up preferred leads were expected to generate more leads per hour than those making cold calls. After the automated predictive dialer system was installed in 1992, TSRs doing cold calls were expected to write at a 1.0 LWR, or one lead per hour on the system. TSRs doing preferred calls were expected to write at a .35 LWR, or about three leads per hour.

After a lead was generated it had to be "verified" by a telemarketing manager, supervisor, or, after that position was created in 1993, a group leader. Essentially, this process determined that the consumer contacted by the TSR owned the home and had an interest in the KoolVent product, and that all homeowners would be present when a sales representative was scheduled for a demonstration. A lead that could not be verified was "burned" or "killed."

Verified leads were then provided to the appropriate branch sales office and assigned to a sales representative. As lead centers were frequently being developed or closed, there was not necessarily a geographic correlation between the location of a lead center and the area for which leads were generated and verified. For example, TSRs in the Pittsburgh Lead Center at various times generated leads for the Florida market; this was known as "supporting" Florida. After verification in the Pittsburgh Lead Center, those leads would be followed up by Florida sales reps. TSRs were sometimes given information regarding neighborhoods in particular areas where KoolVent did or did not expect to generate leads. Employees verifying leads were sometimes given maps of the area, so that appointments could be set for the sales rep from the closest city and also so that the distances a rep must travel between appointments were apparent to the scheduler.

Leads issued to branch sales offices resulted in one of eight outcomes or "dispositions": (1) sale; (2) no home (i.e., one or both homeowners were not at home); (3) demo (i.e., the product was demonstrated and an estimate was given); (4) no demo (i.e., the consumers were there, but the sales representative could not demonstrate the product or leave

an estimate, e.g., because the consumer denied having made the appointment); (5) customer called to cancel; (6) no lead/no credit (e.g., the home is a mobile home for which financing cannot be obtained or the consumers do not own the home or KoolVent cannot do the work because, for example, the consumer wants round-top windows, which KoolVent does not manufacture); (7) not covered (i.e., the lead was issued to a sales representative, but he or she was unable to keep the appointment, e.g., because of weather or the way the appointments were blocked (set) by time or territory); or (8) not issued (i.e., the sales manager did not give the lead to a sales representative, e.g., because it was impossible to cover due to the time and place it was set for).

TSRs were paid a salary and could receive a bonus based on "net new orders" and/or on the percentage of leads that resulted in demos. Sales reps, on the other hand, were paid a commission based on the number of installed sales. Sales reps were not salaried.

1993 and 1994 were years of transition and reorganization at KoolVent. 1993 was the worst year in company history, and KoolVent had losses of several million dollars. At the time, the company was organized with several different lead centers. It was decided that a single "mega" lead center could most efficiently support all KoolVent sales offices. By June 1993, KoolVent had closed all but one lead center—the Pittsburgh Lead Center. Gabrielle Frye was transferred from Charleston to manage the center. Within the KoolVent organization, Frye was directly responsible to Vice President Krempasky, and was responsible for supervising the telemarketing supervisors. In June 1993 these supervisors were Dave Marchik (also field coordinator), Bill Milesky, Jon Rebel, Mary Williams, Delmetris Peterkin (who had transferred to Pittsburgh when the Charleston Lead Center closed), and plaintiff Larry Moss. Williams, Peterkin, and Moss are African–American.

We find credible the testimony of both Frye and Peterkin that the atmosphere at the Pittsburgh Lead Center was negative and unruly when they transferred to the center from Charleston.

A new position of group leader was created as part of this restructuring. Each of the telemarketing supervisors was assigned one group leader and specific sales offices to support. Plaintiff Arthur Basnight, Matt Meyers, Rick Vrana, and Tammy Lewis were promoted from TSRs to that position. When Peterkin started at Pittsburgh, she had no group leader. She chose TSR Paul Jackson, who is African–American, and promoted him to group leader.

Telemarketing supervisors were expected to verify leads written by their TSRs. They were required to issue a set amount of leads per branch per day, usually 20. They were expected to generate a cold call LWR in their groups of 1.0 or better. They were expected to generate enough leads to reach a "demo" percentage of 50–55%, sales of about 12%, and to reduce the percentages of no homes and no demos to between 10% and 15% of leads written. In addition, telemarketing supervisors worked with sales managers blocking leads for the sales reps. It was the supervisors' responsibility to correct problems in the quality or quantity of leads produced by their groups, to work with their assigned group leaders and TSRs on training and production, to discipline and evaluate their personnel, and to generate appropriate reports. (Def's. Ex. D; C–17; C–19(4.a); EEE–20).

Group leader and sales office support assignments changed frequently for each of the telemarketing supervisors, including plaintiff Moss. All telemarketing supervisors were assigned and reassigned to support a changing combination of different sales offices and to supervise a number of different group leaders and TSRs. The company changed assignments frequently in an attempt to increase productivity, and, at times, to accommodate the needs of individual employees. Although Moss apparently had difficulty adapting to the frequent shifting of assignments and personnel, there is no evidence that he was treated any differently than any other Kool-Vent supervisors in this regard, or that any of his assignments were intended to impede his advancement in the company. KoolVent had legitimate business reasons for each restructuring decision that affected the plaintiff.

The company again revised its marketing strategy in late 1993, and abandoned the mega lead center plan. Between December 1993 and May 1994, KoolVent opened four new lead centers in Monroeville and Greensburg, Pennsylvania; Orlando, Florida; and Morgantown, West Virginia.

Then in July 1994, KoolVent closed its entire Florida operation, including the Orlando Lead Center, due to a continuing inability to obtain bank financing for its customers for the home improvement products KoolVent successfully sold in Florida. By September 1994, the Pittsburgh Lead Center had also been closed. Although the last quarter of 1994 was reasonably good, KoolVent sustained a loss of $1 million or more in 1994. However, the efforts made during these years of transition ultimately paid off for the company, which had its best year ever in 1995.

### Plaintiff Moss' Employment

Plaintiff Larry Moss was hired as a telemarketer in the Pittsburgh Lead Center in April 1991 and was promoted to the position of telemarketing supervisor that October. Moss was demoted to a TSR on February 17, 1992 by his supervisor, Deborah Supe, for issuing leads that were not properly verified. The evaluation placed in his personnel file at that time shows that Moss received 51 out of 100 points, the lowest score given to any telemarketing supervisor. (Def.'s Exs. C–2–5, V–29).

After his demotion, Moss filed a complaint with the local chapter of the NAACP and met with Harvey Adams, then president of the Pittsburgh NAACP chapter. Larry Krempasky, Vice President for Telemarketing and Chuck Klinzing, KoolVent Personnel Director, reviewed Moss' personnel file. Adams met with Klinzing and discussed plaintiff Moss. Klinzing determined that Moss had not been warned that his performance could result in demotion, and recommended reinstatement. Krempasky adopted the recommendation. Moss was reinstated to his position as a telemarketing supervisor at the Pittsburgh Lead Center on March 1, 1992 with back wages and benefits. Mary

Cross, a Caucasian woman who was Assistant Manager of the Pittsburgh Lead Center, was demoted at the same time. Klinzing also determined that she had not been adequately warned, and she, too, was reinstated. Cross subsequently resigned.

Moss testified that no one in KoolVent's management made any negative remarks to him about the NAACP charge. In addition, Moss testified that he never heard anyone at KoolVent make any racist remarks, either to him personally or about anyone else.

Deborah Supe was replaced as Lead Center Manager at Pittsburgh by Gary Yarber in April of 1992. Yarber had previously worked for KoolVent. Michael Madden, Vice President of Sales, recommended hiring Yarber to replace Supe, but Krempasky opposed the hire. Before he was hired, Yarber met with Krempasky and Madden for lunch. Yarber testified that they met at the Hunt Valley Marriot, Hunt Valley, Maryland. Madden recollected that he met with Yarber alone at Hunt Valley, but that the meeting with Krempasky occurred at a restaurant in Baltimore.

Yarber testified that at that meeting Krempasky made racial slurs, stating in reference to Moss that Yarber "would have difficulty with this little nigger." Yarber stated that Krempasky also told him that Moss had filed a charge with the NAACP. We do not find credible the testimony of Gary Yarber that racial slurs were made at this meeting. Yarber did not tell Moss about the alleged racial slurs until May of 1994, after Moss had been discharged and, significantly, after Yarber himself had been fired. We find credible the testimony of defendant's witness Michael Zabec, who had worked at KoolVent with both Krempasky and Yarber and who later hired Yarber to work with him in Maryland. Zabec testified that after leaving KoolVent Yarber often complained about Krempasky and said he would get even. Yarber himself used racial slurs, and Zabec received complaints about Yarber's attitude toward African–American employees.

Rick Vrana also testified to Yarber's preoccupation with Krempasky. Vrana resigned from KoolVent in January 1994, and went to work for Yarber for about two months. During that time, Vrana lived at Yarber's house. We find credible his testimony that a year after Yarber had been discharged from KoolVent, Yarber still spoke regularly about getting even with Krempasky.

During Yarber's stint as manager, Yarber worked well with both Moss and Basnight. Yarber suggested that Krempasky create a position of Assistant Lead Center Manager, and that Moss be promoted to that position. The new position was not created.

Yarber's employment was terminated for nonperformance and absenteeism in March 1993. In April, Gabrielle Frye was transferred from the Charleston Lead Center and became Manager of the Pittsburgh Lead Center and plaintiffs' supervisor. We find credible Frye's testimony regarding Moss' performance. Moss himself informed her that he had been demoted and had filed a complaint with the NAACP; Frye did not receive that information from Krempasky. She consistently got complaints from sales managers about Moss' performance. Moss was issuing a high percentage of no homes and no demos, was blocking the leads inconveniently for the sales reps, and was not verifying leads according to company policy.

As their manager, Frye evaluated all telemarketing supervisors except Peterkin in June 1993. She had recently evaluated Peterkin while both were still at Charleston, and given Peterkin a 76 rating. (Def's. Ex. HHH–61–63). Frye rated Milesky at 72, Rebel at 65, Williams at 64, and Moss at 54. (Def's. Ex. C–9–12; EEE–31–34; FFF–7–10; GGG–62–65).

Frye reviewed the evaluation with Moss, and emphasized to him the need to display a positive image to his group, to recognize problem areas and work on solutions rather than making excuses, and to stay focused on the job. (Def's. Ex. C–9–12).

Frye did another assessment of her supervisors' performance in July. Frye wrote that Peterkin and Rebel had the potential to succeed. (Def's. Ex. HHH–52, EEE–30). Although Frye expressed some criticism of each of the telemarketing supervisors in her July appraisals, Moss received the most com-

ments and the most criticism. (*Cf.* Def's. Ex. HHH–52, EEE–30, FFF–4, GGG–58).

In her July evaluation, Frye noted that Moss had a "gives up" attitude; that his lead delivery was below the needed level; that his attitude toward KoolVent was up and down, as were his work habits; that his no home and no demo percentages were increasing; that he needed to do verification properly by using the wrap-up; that he was not issuing enough cold call leads (i.e., he was issuing too many leads from easier preferred sources) and that he needed to stop focusing on the past, to quit making excuses to the sales managers and quit looking at suggestions from management as if they were "some kind of set up." (Def's. Ex. C–12–13). On cross-examination, Moss acknowledged that he got this appraisal and that he understood the problems with his production.

Frye testified that Moss had talent and performed well when he was focused, but that it was hard to keep him focused; he had good days and bad days; his performance was up and down. Frye stated that Moss was good on the phone with consumers, was good at training TSRs when he was focused, and was likable. However, he had difficulty with the sales department because he short-cut verification, did not communicate well with sales managers, and did not follow through to address their concerns.

On October 20, 1993, Moss was assigned to support the Florida sales offices. This change occurred because Williams, the supervisor who had been supporting Florida, was diagnosed with breast cancer and took a leave of absence. In addition, Altoona, one of the three offices Moss had been supporting, had closed in early October. There is no evidence that this or any of Moss' other assignments were in any way punitive.

Moss did not do well in the assignment to support the Florida sales offices. John Stermon was in charge of Sales in the Florida region from the Summer of 1993 (when KoolVent opened sales offices in Jacksonville, Orlando, Tampa and Miami, Florida) until KoolVent closed the entire region in July 1994. We find credible Stermon's testimony regarding serious deficiencies in Moss' performance while Moss was responsible for

generating leads to the Florida sales offices. Stermon testified that the no home percentage on the leads Moss issued to Florida consistently exceeded 40%.

Stermon also testified that Moss did not block leads properly, and that he continued to issue leads in areas where there were trailer parks, and in parts of Miami and St. Petersburg that were unsafe for sales reps. Moss was relieved of responsibility for Florida on or about November 19, and Jon Rebel took over that assignment.

Moss was then assigned to training and recruitment. He had previously told Frye that he would welcome the opportunity to do training, and Moss testified that he considered himself good at working with struggling TSRs. His salary was not reduced with this new assignment.

Moss was treated by clinical psychologist Lloyd Bell, Ph.D. Dr. Bell testified as plaintiffs' expert on the particular problems encountered by African–American men in the workplace. It was Dr. Bell's opinion that Moss felt abandoned and unsupported by KoolVent management.

On January 5, 1994, Moss filed a complaint with EEOC (Pl's. Ex. 3) and then went to meet with Harvey Adams. KoolVent received written notice of the EEOC charges in a document dated January 14, 1994, which was sent to Gary Iskra as company president. (Def's. Ex. YY). Three other KoolVent employees also filed charges that month. In a document dated January 10, 1994, KoolVent was notified that Arthur Basnight had filed charges of discrimination with the EEOC. (Def's. Ex. ZZ). An EEOC notice of charges filed by Delmetris Peterkin was dated January 18 (Def's. Ex. AAA), and the notice of charges filed by Mary Ellen Williams was dated January 21 (Def's. Ex. BBB). Peterkin was subsequently offered her choice of positions as manager at either the Pittsburgh Lead Center or the Monroeville Roofing Lead Center, and chose the Pittsburgh position. Her promotion created an opening for supervisor at the Pittsburgh Lead Center. Williams was promoted to that position effective February 1, 1994.

On January 7, 1994, a meeting was held at corporate headquarters in Monroeville. The focus was on productivity standards. Iskra, Krempasky, Frye, Rebel, and Flanigan all attended that meeting. Klinzing was briefly present. We note that each of these witnesses presented slightly different versions of the meeting. Flanigan was eventually fired; Rebel quit and his request for reinstatement was denied. Both testified for the plaintiffs.

It is undisputed that low productivity at the Pittsburgh Lead Center was a main topic of discussion. Iskra was told that Moss and Cliff Pitts were the reason for the low production and low morale. Iskra said that if they were causing the problems, they, the "troublemakers," should be fired. Iskra did not state that if they were filing charges or lawsuits then they should be fired. Race was not mentioned. Both Rebel and Frye thought that Moss should not be terminated, because he had the support of his TSRS and firing him would not solve the problems at the lead center.

During that meeting, someone commented that termination could lead to lawsuits. Iskra responded to the effect that big companies get sued, and that the lawyers would take care of it.

There is no credible evidence that Kool-Vent management had received notice of any of the EEOC filings at the time of the January 7 meeting. There is no credible evidence that the race of any KoolVent employee was discussed at the meeting. Harvey Adams telephoned Klinzing on January 10 and told him that Moss and Basnight had filed charges and that there was a possibility of a class action lawsuit. Klinzing then went to the Pittsburgh Lead Center to meet with Moss. Moss gave Klinzing a letter dated January 10, 1994, in which he and Basnight refused to meet until the company had received the formal complaint from the EEOC. (Def's. Ex. P).

Beginning in early February, Moss was reassigned to support the Harrisburg, Greensburg, Allentown, and Philadelphia sales offices along with Mary Ellen Williams. There were continuing problems with his performance. The Pittsburgh Lead Center did not achieve its production goals in March 1994, and was averaging only a 1.7 LWR with an experienced staff of TSRs. More recently opened lead centers with new TSRs were generating higher ratios. On March 24 Krempasky met with Peterkin to discuss the individual performance of the center's managers, and told her that the Pittsburgh center needed to turn around in April.

Peterkin promptly met with Basnight, Moss and Williams about improving their production. She told them that she would be monitoring their production, and that if it did not improve changes would be made. (Def's. Ex. L). This was reinforced by a memo from Krempasky, which stated that if production did not increase disciplinary action, including termination, would result. (Def's. Ex. K). Krempasky and Peterkin each met with Moss numerous times to discuss his production.

In mid–April, Peterkin changed the assignments for her supervisors so that she could more carefully monitor their productivity. Moss and Williams had been jointly supporting four sales offices; Moss was now assigned to support Harrisburg and Philadelphia, and Williams was assigned the other two offices. In memos dated May 3 and May 9, 1994, Peterkin criticized the performance of both Moss and Williams. She found their performance in the category of "lead target goals" was "unacceptable." (Pl's. Ex. 25, 26). Moss' no home rate was 35% in Harrisburg and 30% in Philadelphia.

Tim McFarlane, Harrisburg branch sales manager, was equally frustrated with Moss' work, particularly with the quality and blocking of leads. Madden assigned Bruce Irving to help supply leads to Harrisburg.

McFarlane, Peterkin and Krempasky discussed the continuing problems with the Harrisburg leads in a conference call with Moss on May 13. In a memo to Moss dated May 16, Peterkin stressed that "we must see an immediate improvement in both the Harrisburg and Philadelphia markets.... If we do not see a major improvement disciplinary action will be necessitated." (Def's. Ex. O).

On May 17, 1994, Moss was involved in what several witnesses called the "Marva

Greer incident" at the Pittsburgh Lead Center. Briefly stated, Moss held a meeting with his telemarketers and made statements that caused TSR Marva Greer to enter Peterkin's office and complain about the way Moss was being treated. Peterkin had previously told Moss that her conversations with him were not to be repeated to the TSRs. The confrontation ended with Greer calling Peterkin "a sellout whore" and Peterkin firing Greer. Peterkin reported that incident by telephone to Klinzing that same day, and in a memo to Krempasky dated May 20. (Def's. Ex. OP).

Klinzing informed Peterkin that he was going to lay off Moss without offering him another position. Moss was effectively terminated on May 20, 1994. Klinzing made the decision to lay him off so that Moss could collect unemployment.

The Pittsburgh Lead Center was downsizing; indeed, by September, the center would be closed. Responsibility for the Harrisburg sales office had been transferred to the new Greensburg Lead Center, leaving Pittsburgh with only two offices to support. KoolVent determined that Pittsburgh needed only one telemarketing supervisor, and retained Mary Ellen Williams because Williams had been employed by KoolVent longer than Moss had. Moss' position as supervisor was eliminated. Moss requested demotion but Klinzing refused. Moss was not given another position with the company because of the problems with the Harrisburg leads and the Marva Greer incident.

### Lead Center Manager Positions

KoolVent's reorganization created new lead centers and the need for management. At issue here are positions as Lead Center Manager in Pittsburgh, Orlando, Monroeville, and Greensburg. We find credible Krempasky's testimony that at the time these positions were being filled the only two supervisors deemed capable of handling the position of lead center manager were Jon Rebel and Delmetris Peterkin. Both were promoted. In addition, KoolVent hired Tim Flanigan as a manager-in-training in November of 1993. Flanigan had previously held consultant and management positions in telemarketing.

With regard to the Pittsburgh Lead Center, plaintiff Moss asserts that Tim Flanigan was promoted to the position of Lead Center Manager in Pittsburgh for a brief period of time before Peterkin was promoted to that position. However, the evidence shows that Flanigan was never promoted to a managerial position in Pittsburgh or elsewhere in the company. Flanigan testified as plaintiff's witness that he was never promoted to that position, and Moss produced no testimony to show otherwise. The Pittsburgh position went to Peterkin, an African–American woman, and Moss does not contend that he should have received the promotion instead of Peterkin. Flanigan was fired by KoolVent in February 1993.

The opening of the Orlando Lead Center and the need for a manager there was announced in November 1993, at a meeting of supervisors and group leaders in Pittsburgh. Madden, Frye, Moss and Rebel were among those attending that meeting. Rebel, a Caucasian male, was offered the job. Jon Rebel was extremely well-qualified for the position. Whereas Moss had failed to block leads properly and created numerous problems for the Florida sales reps, Rebel had taken over that assignment and done an excellent job supporting Florida. Rebel had been named "Supervisor of the Year" in 1992. In addition to the fact that Rebel was better qualified, we find credible the testimony of both Madden and Frye that Rebel was the only supervisor who expressed interest in the position. Moss did not indicate an interest in the Florida job to his supervisors. In fact, Moss told both Madden and Rebel that he could not relocate away from Pittsburgh because of family concerns.

The Monroeville Roofing Lead Center, a new direction for KoolVent, opened in late December 1993. Delmetris Peterkin was offered the position of Lead Center Manager but turned it down in favor of the Pittsburgh position. No one was promoted to the manager position during the Winter of 1993–94 because no one else was considered qualified. (Def's. Ex. YYY). Matt Meyers was promoted to supervisor or acting supervisor in December. (Def's. Ex. YYY, JJJ–32). This

was the highest management position in Monroeville, but was not a manager position.

Meyers joined KoolVent as a TSR at the Pittsburgh Lead Center in January 1992. Meyers was related to Krempasky by marriage. He had a college degree. He had been promoted to lead verifier and then to group leader, and when David Marchik took a leave of absence in November 1993, was assigned along with group leader Rick Vrana to manage lead delivery for Harrisburg, Allentown, and Philadelphia. The men retained the "group leader" title and pay. Both Meyers and Vrana did an outstanding job at this task. When Marchik resigned in late November, the two continued to support those three offices, and set records for those sales offices for the months of November and December.

Moss, as Meyers' supervisor, evaluated him favorably. Moss stated that Meyers had "good leadership qualities" and showed "potential in future management positions." (Def's. Ex. JJJ-37).

Moss contends that Meyers was promoted to supervisor in Monroeville with the understanding that the supervisor's position would turn into a Lead Center Manager position, and that he, Moss, should have received it instead. There was no evidence that a future promotion was expected, either by KoolVent management or by Meyers. As previously noted, Peterkin, an African–American female, was offered and encouraged to accept the manager position. When Peterkin declined, a management decision was made to open the new roofing lead center without a manager because no one else was qualified for promotion to that position.

Meyers performed well as acting supervisor; despite the fact that only one of his TSRs, Karen Thurner, was experienced, the office generated a demo percentage above 40%. Meyers was promoted to the position of acting manager in March 1994; this was a change in title and salary, but not in responsibilities. Meyers was promoted to Manager of the Orlando Lead Center in June 1994, after both Moss and Basnight were no longer employed by KoolVent. Only in August 1994, after the Orlando Lead Center closed,

did Meyers become the Manager of the Monroeville Roofing Lead Center.

Bruce Irving, an African–American, was hired as a manager-in-training in March 1994. Irving had previously worked for KoolVent, and had additional telemarketing management experience. We find credible the testimony of Larry Krempasky that at the time Irving was hired Moss was not promoted because his performance as supervisor had not been satisfactory. The Greensburg Lead Center opened in May of 1994, and Irving became acting manager. He was promoted to manager of that center on June 1, 1994, after Moss had left KoolVent.

### Plaintiff Basnight's Employment

Plaintiff Arthur Basnight was hired as a telemarketer at the Pittsburgh Lead Center in August 1991.

Lead Center Supervisor Gary Yarber created a new position of field sales coordinator in June 1992, and promoted Basnight to that job. Basnight testified that when he was promoted to field service coordinator, he was warned that he might hear some racist remarks from some of the sales employees. There was conflicting testimony regarding this issue, including whether or not Basnight had complained to the company about such racist remarks. However, Basnight himself testified that when he did hear such comments, Madden, Vice President for Sales, contacted the sales managers and directed them to curb their language.

During the 1993 restructuring and creation of the mega lead center in Pittsburgh, KoolVent added the new position of group leader. Group leaders supervised a group of TSRs and reported to a lead center supervisor. In addition, group leaders interacted with sales reps in the field. Lead Center Manager Gabrielle Frye promoted Basnight to Group Leader along with Tammy Lewis, Rick Vrana, and Matt Meyers.

Basnight's first supervisor as a group leader was Jon Rebel. Rebel testified that plaintiff had difficulty focusing on the job at hand and that he was easily distracted by the TSRs. Rebel stated that he would not have promoted Basnight to the group leader position.

When Matt Meyers was promoted from group leader to acting supervisor of the Monroeville operation, Basnight filed a charge of discrimination with the EEOC. KoolVent received notice of the charge in a document dated January 10, 1994. Plaintiff accompanied Lawrence Moss when Moss met with Harvey Adams. He was treated by Dr. Bell for emotional problems relating to his employment situation.

Peterkin evaluated Basnight's performance on March 3, 1994. She scored him at a 68, or marginal candidate for promotion, and noted that he had been given a warning to write 2 resets, 2 rehashes, and 2 TV's per office and that he had not yet achieved those goals. (Def's. Ex. KK–3). At this time, Basnight was the only group leader in Pittsburgh. These quotas were new, and had not been expected of group leaders in the past. Peterkin's evaluation noted that Basnight had good work habits as long as he stayed focused.

A meeting was held in late March 1994, to discuss Basnight's low productivity. KoolVent's records show that between April 1 and April 15, 1994, Basnight repeatedly failed to meet his goals. (Def's. Ex. NN, NN–1). We find credible Peterkin's testimony that she had never before or since worked with a group leader who had lower productivity than plaintiff Basnight.

Basnight's employment was terminated on April 20, 1994 by Klinzing and Peterkin for low productivity.

### Supervisory Promotions

By the end of 1993, the Pittsburgh Lead Center had seven group leaders: Basnight, Vrana, Lewis, Paul Jackson, Meyers, Cliff Pitts, and Mary Ellen Williams. Basnight, Jackson, Pitts, and Williams were African American. (Def's. Ex. YYY).

Williams was re-promoted to supervisor, but remained in Pittsburgh because of her health. Pitts decided that he did not want a supervisory position, and in fact stepped down from his group leader position. Lewis was not promoted and took a job as a UNIX Computer Operator at the Monroeville Roofing Lead Center at less than the $20,000 salary earned by all group leaders at that time.

Meyers was promoted from group leader to the acting supervisor of the Monroeville Roofing Lead Center. Basnight claims that he was passed over for promotion to this job. The evidence, as previously detailed, shows that Meyers was better qualified for this position than was any other group leader, including Basnight.

Basnight does not claim he should have been given the supervisor's position at the new Morgantown Lead Center, which went to an African–American male. Frye's first choice for supervisor in Morgantown was Peterkin, but she did not want to relocate again and instead accepted the position in Pittsburgh. Frye then promoted group leader Paul Jackson to the position of Supervisor for Morgantown. (Def's. Ex. YYY; QQQ). When Jackson was subsequently incarcerated, Kevin Kizer, an African–American TSR at the Pittsburgh Lead Center, was promoted to supervisor and transferred to Morgantown. We find credible Frye's testimony that although both Jackson and Kizer had less group leader experience than plaintiff Basnight, they were better able to assume supervisory responsibilities than either of the plaintiffs.

Thus, of the four African–Americans who were group leaders in the fall of 1993, Pitts took himself out of contention for a promotion, Williams and Jackson were promoted to supervisor, and Basnight was not promoted. Of the three Caucasian group leaders, Meyers was promoted, Vrana was not promoted and remained a group leader in Monroeville throughout this period, and Lewis was not promoted and changed jobs. There is no evidence that race was a factor in any of these employment decisions.

### CONCLUSIONS OF LAW

In accordance with Title VII of the Civil Rights Act of 1964, as amended, an employer is prohibited from discriminating on the basis of race. The statute provides as follows:

It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or oth-

erwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e–3(a).

Section 704(a) of Title VII prohibits retaliation. "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge ... under this subchapter." 42 U.S.C. § 2000e–3(a).

Section 1981 also prohibits discriminatory treatment, stating in pertinent part that:

All persons within the jurisdiction of the United States shall have the same right in every state and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.

The legal elements and burden of proof for claims brought under Title VII and § 1981 are identical. *Lewis v. University of Pittsburgh*, 725 F.2d 910, 915 n. 5 (3d Cir.1983), *cert. denied*, 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984). A plaintiff must prove that the defendant employer intentionally discriminated against him because of his race or that the employer retaliated against him because he filed a charge of discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

To establish a prima facie case of employment discrimination, the plaintiff must establish the following elements by a preponderance of the evidence: (1) that he was a member of a protected class, (2) that he was qualified for a position or a promotion, (3) that he suffered an adverse employment decision, and (4) that similarly situated individuals who were not members of a protected class were hired or promoted instead. *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1066 n. 5 (3d Cir.1996) (en banc); *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)).

To establish a prima facie case of retaliation, the plaintiff must show that (1) he engaged in conduct protected by Title VII, (2) he suffered an adverse employment decision, and (3) causation between the protected conduct and the employment decision. *Barber v. CSX Distribution Serv.*, 68 F.3d 694, 701 (3d Cir.1995).

The nature of plaintiff's proof of employment discrimination determines whether the claims are analyzed under one of two frameworks: mixed motives, also known as direct evidence, or pretext.

Where plaintiff offers direct evidence that discriminatory animus was a substantial factor in the employment decision, the case is analyzed as a "mixed motives" case under the criteria first set out in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In a mixed motives analysis, once the plaintiff has established a prima facie case the burden of persuasion then shifts to the employer to show that even if discrimination was a motivating factor in the employment decision, the employer would have made the same decision without the discriminatory animus. *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir.1994).

Neither stray remarks in the workplace nor discriminatory statements made by non-decisionmakers are direct evidence of discriminatory animus. *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. at 1804 (O'Connor, J. concurring). Nor are discriminatory statements made by a decisionmaker, where unrelated to the decisionmaking process. *Id.*

Where a plaintiff does not offer direct evidence of discriminatory animus, but instead produces evidence from which the finder of fact may infer that discrimination was part of the decisionmaking process, the proper analysis is pretext. The plaintiff must show that the prohibited factor "played a role in the decisionmaking process and that it had a determinative influence on the outcome of that process." *Miller v. CIGNA Corp.*, 47

F.3d 586, 597 (3d Cir.1995) (en banc).[3] Under this theory, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employment decision. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The burden then shifts back to the plaintiff to show that the proffered reason is pretext for discriminatory animus.

To discredit the employer's proffered reason for its decision, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765.

Finally, we note that in a bench trial, "sitting as the trier of fact, the Court is called upon to assess the credibility of the witnesses." *Nixon v. Runyon*, 856 F.Supp. 977, 985 (E.D.Pa.1994) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

With these legal principles in mind, we now turn to the claims raised by plaintiffs Lawrence Moss and Arthur Basnight.

### Failure to Promote Claims: Lawrence Moss

Lawrence Moss contends that he was denied promotions to the positions of lead center manager in Pittsburgh, Orlando, Monroeville, and Greensburg. He was allegedly denied these promotions in violation of Title VII because of his race and/or in retaliation for filing charges of discrimination against KoolVent with the EEOC and the NAACP.

■ With respect to the position at the Greensburg Lead Center, plaintiff has failed to make out a prima facie case of race discrimination in that the position at issue was filled by Bruce Irving, an African–American. Irving had been hired as a manager-in-training, was promoted to acting manager when the Greensburg Lead Center opened, and

again promoted to manager on June 1, 1994, when Moss was no longer with the company. Plaintiff has failed to show that a similarly situated individual from a non-protected class was promoted instead of him, and therefore we find for the defendant on this claim.

Regarding the position at the Pittsburgh Lead Center that plaintiff alleges went to Tim Flanigan, we note that Mr. Flanigan's own testimony at trial established that he was never promoted to that position and that plaintiff Moss produced no testimony to show otherwise. Accordingly, we find for the defendant on this claim.

■ Plaintiff Moss has made out a prima facie case that he was not promoted to manager of the Monroeville or Orlando Lead Centers because of his race. Both Matt Meyers, who went to Monroeville, and Jon Rebel, who became manager in Orlando, are Caucasian. Plaintiff argues that he has produced direct evidence of discrimination, and that we must consider his claims within the *Price Waterhouse* framework. We disagree. The only direct evidence of discriminatory animus produced by the plaintiff on the issue of these promotions was the racial slur Krempasky allegedly made to Yarber during their lunch meeting with Madden in Maryland. We do not find credible the testimony of Gary Yarber that racial slurs were made at this meeting. Yarber did not tell Moss that such statements had allegedly been made until after Moss had been discharged and, significantly, after Yarber himself had been fired from KoolVent. Yarber appears to have an almost obsessive dislike for Krempasky as well as a desire to get even with both Krempasky and with KoolVent. Yarber was the only witness to testify to this racial slur. Moss himself testified that no one at KoolVent, including Krempasky, Klinzing, Iskra, and Peterkin, all of whom were in a decision making capacity, ever made any racist remarks to him personally or in his presence about anyone else.

---

**3.** We are aware that a panel of the Court of Appeals for the Third Circuit has recently questioned the "determinative effect" standard under *Miller* in the context of pretext cases, in light of § 107(a) of the Civil Rights Act of 1991, Pub.L. No. 102–166. *James W. Woodson v. Scott Paper*

*Co.*, 109 F.3d 913, 935 n. 29 (3d Cir.1997). However, the court expressly did not reach the issue and thus *Miller* remains controlling authority. Furthermore, under either a determinative effect test or a motivating factor test, we would reach the same results in this case.

We find that plaintiff has produced no direct evidence of discriminatory animus. However, even if Moss had shown that discriminatory animus had been a motivating factor in KoolVent's decisions not to promote Moss to the manager positions in Monroeville and Orlando, under the *Price Waterhouse* framework we find that KoolVent has met its burden of convincing the Court that it would have made the same employment decisions absent the animus. The evidence clearly shows that Moss' performance did not make him a good choice for either of these promotions. With the exception of Gary Yarber, each of Moss' supervisors at the Pittsburgh Lead Center documented his problems with production. In particular, his inability to properly support the Florida and Harrisburg sales offices caused great difficulties for the company.

The evidence shows that Jon Rebel was more qualified than Moss to manage the Orlando Lead Center. In addition, Moss did not express an interest in the job when it was first announced and told both Madden and Rebel that he could not relocate away from Pittsburgh for personal and family reasons. We find for the defendant on this claim: Rebel was promoted for legitimate, nondiscriminatory reasons, and Moss was not passed over for this promotion because of his race.

With regard to the Monroeville Roofing Lead Center, Moss concedes that Meyers was promoted from group leader to acting supervisor when the center opened. Thus, the position Meyers accepted would not even have been a promotion for the plaintiff. Moss' argument is that it was understood that the Monroeville position would turn into a manager position. This contention is simply not supported by the evidence.

Delmetris Peterkin, an African–American, was offered the promotion to manager in Monroeville and encouraged to accept it. She and Rebel were the only supervisors the company considered ready for such a promotion, and Rebel had been promoted to a manager position in Florida. When Peterkin turned the job down to remain in Pittsburgh, the decision was made to open and operate Monroeville without a manager because no one else was qualified. When Meyers performed well as acting supervisor, he was promoted to acting manager. He did not receive a promotion to manager until June 1994, when he was promoted to Manager of the Orlando Lead Center after Rebel left. Both plaintiffs had left KoolVent by June 1994.

Moss was not denied a position at the new Monroeville Roofing Lead Center because of his race, and therefore we find for the defendant on this claim.

In short, there is no direct evidence that KoolVent promoted either Rebel or Meyers instead of Moss due to any discriminatory motive. Defendant KoolVent promoted the most qualified individuals, and there is no evidence that race affected these promotions in any way.

At best, plaintiff has set forth evidence that may raise an inference that discrimination played a role in the decision making process. This places this action within the pretext framework, and requires that Kool-Vent articulate a legitimate, nondiscriminatory reason for its employment decision. *Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). We find that defendant met this burden with the evidence considered in the above analysis of direct evidence, and will not reiterate that discussion here.

Under *Burdine*, the burden now shifts back to the plaintiff, to show that the reasons set forth for KoolVent's promotion of Jon Rebel and Matt Meyers are merely pretext for discriminatory animus. Plaintiff has not met this burden. The evidence shows that there were continued problems with the quality of Moss' leads. There was clearly friction between Moss and the sales offices he was assigned to support. His evaluations show that his supervisors had difficulty with his production and with his attitude.

Furthermore, with regard to the Monroeville position, we note that the employee considered best qualified to be promoted to manager was Delmetris Peterkin, an African–American. Peterkin was offered the promotion and declined it. When she did so, Meyers was not promoted to manager be-

cause the company did not think he was qualified. Instead, he became the acting supervisor, a position which would have been a lateral move at best for the plaintiff. Moss' claims that the company's reasons for hiring Meyers were simply a pretext for discriminatory animus must fail in light of the fact that Peterkin was first offered the position of manager.

Turning to the Orlando promotion that Moss claims he did not get because of his race, we note that Moss said he could not relocate away from Pittsburgh.

We find that the reasons set forth by the company for promoting other employees to the positions Moss claims he was denied were legitimate business decisions and not pretext for discrimination. Accordingly, we find for the defendant on these claims. Under either theory, mixed motives or pretext, plaintiff Moss has failed to prove by a preponderance of the evidence that KoolVent did not promote him to the positions he sought because of his race.

### Failure to Promote: Arthur Basnight

Plaintiff claims he was not promoted to the position of supervisor at the Monroeville Roofing Lead Center because of his race. Matt Meyers, a Caucasian, received that promotion. Meyers and Basnight were both group leaders at the Pittsburgh Lead Center.

Basnight produced no direct evidence of any discriminatory animus on the part of any decision maker that could have affected his promotion. The only evidence of possible discriminatory animus submitted by plaintiff Basnight at trial is his own testimony that when Yarber promoted him to field service coordinator he was told that he might hear some racist remarks from some of the sales employees. Basnight further testified that when he heard such comments, the company directed the offenders to curb their language. There is no direct evidence of discriminatory animus to bring Basnight's failure to promote claims within a mixed motives framework.

Analyzing Basnight's position under the pretext paradigm, KoolVent must now articulate a legitimate, nondiscriminatory reason for promoting Meyers instead of Basnight.

Defendant has met this burden. The evidence shows that Meyers was the better qualified group leader. He received favorable evaluations and had done a good job managing lead delivery for Harrisburg, Altoona, and Philadelphia when Dave Marchik took a leave of absence and the company needed him to step in. Along with Rick Vrana, Meyers had performed the work of a supervisor at group leader pay.

Since KoolVent has given a legitimate, nondiscriminatory reason for promoting Meyers, Basnight must now show that the reasons proffered for Meyers' promotion are merely pretext for discriminatory animus. This he has not shown. The evidence shows that KoolVent did promote qualified African–American group leaders as well as qualified Caucasian group leaders. Of the four African–Americans who were group leaders in the fall of 1993, Pitts took himself out of contention for a promotion, Williams and Jackson were promoted to supervisor, and only Basnight was not promoted. Of the three Caucasian group leaders, Meyers was promoted, and Vrana and Lewis were not promoted. There is no evidence that race was a factor in any of these employment decisions.

Since plaintiff has failed to prove that KoolVent's stated reasons for promoting Meyers instead of Basnight to the position at the Monroeville Roofing Lead Center were a pretext for forbidden discriminatory animus, we find for the defendant on this claim.

### Failure to Promote: Retaliation

Both Moss and Basnight further allege that KoolVent did not promote them to the above positions in retaliation for having filed charges with various agencies, in violation of Title VII, 42 U.S.C. § 2000e–3(a). The evidence does not support their claims of retaliation.

In February 1992, following a demotion, Moss filed a charge with the NAACP and consulted with Harvey Adams, the association's local president. KoolVent's Director of Human Resources, Chuck Klinzing, also met with Adams. Mary Cross, a Caucasian woman, had been demoted at the same time. Following a review of their respective per-

sonnel files, Klinzing determined that neither employee had been adequately warned that their poor performance could result in demotion. Klinzing recommended that both Moss and Cross be reinstated. Krempasky adopted that recommendation and reinstated both with back wages and benefits. The issue was closed as far as KoolVent was concerned; in fact, when Gabrielle Frye became Manager of the Pittsburgh Lead Center she was not told about the NAACP charge and learned of it only when Moss himself told her. There is no evidence that Moss was ever subsequently denied a promotion or any other employment opportunity, or that any employment decision regarding his assignments was made in retaliation for having filed this charge.

It is undisputed that four KoolVent employees filed charges with the EEOC in January of 1994: Moss, Basnight, Williams, and Peterkin. The only other possible evidence that could be considered direct evidence of discrimination here is the alleged conversation at the meeting in Monroeville on January 7, 1994. We have determined that the EEOC charges filed by Moss and Basnight in January 1994, were not discussed at that meeting, and that KoolVent had not received notice of them at that time.

Since plaintiffs have presented no direct evidence of discrimination, at best we might infer that they were not promoted because they had filed with the EEOC. Accordingly, we will consider these claims under the pretext framework. We find that KoolVent's reasons for not promoting either Moss or Basnight to the positions they contend should have been theirs, thoroughly discussed elsewhere in this opinion, satisfy defendant's burden to articulate legitimate, nondiscriminatory reasons for its business decisions.

It is now the plaintiffs' responsibility to show that these stated reasons are a pretext for discrimination, and this they have failed to do. It is undisputed that both Williams and Peterkin were subsequently promoted, even though the company knew they had filed charges of discrimination. Peterkin was the manager of the Pittsburgh Lead Center when both plaintiffs were terminated, and Williams was the supervisor retained when

Moss' position was eliminated. This shows a lack of discriminatory animus on the part of KoolVent toward those employees who had filed charges. Defendant KoolVent promoted the most qualified individuals, and there is no evidence that either Moss or Basnight was ever denied a promotion because he had filed any charges of discrimination.

Accordingly, we find for the defendant on plaintiffs' claims that they were not promoted because they had filed charges of discrimination.

### Plaintiffs' Discharge Claims

Moss and Basnight each contend that they were ultimately discharged from their respective positions at KoolVent because of their race and/or because they had filed claims of discrimination.

■ We will not reiterate the company's response to the charge Moss filed with the NAACP in 1992. For the reasons stated above, we find that plaintiff was reinstated with back pay and benefits following his demotion, that KoolVent put the incident to rest, and that the fact that charges had been filed had no effect on Moss' subsequent employment or his eventual layoff.

Both plaintiffs filed charges of discrimination with the EEOC in January 1994. Although Peterkin and Williams filed charges as well, neither of these African–American women was fired.

Plaintiffs submit that EEOC charges were discussed at a meeting on January 7, 1994, and that this constitutes direct evidence of discriminatory animus. We do not agree with plaintiffs' characterization of that meeting. The evidence shows that at the meeting KoolVent president Gary Iskra questioned the low morale and low productivity at the Pittsburgh Lead Center. Someone said that Pitts and Moss were responsible for the problems. Iskra stated that if they were causing the problems, the troublemakers should be fired. The comment was made that termination could lead to lawsuits, and Iskra said that the lawyers could deal with that if it happened. There is no credible evidence that the company had received any notice of the EEOC charges filed by Moss or Basnight at the time of the January 7 meet-

ing, and there is no credible evidence that either race or EEOC charges were mentioned at that meeting.

With regard to both plaintiffs, the evidence shows that neither was discharged because of race nor because he had filed charges with the EEOC or with any other agency. The evidence shows that plaintiff Basnight was discharged by Klinzing and Peterkin for low productivity, and not because he had filed charges or because of his race.

Klinzing discharged Moss because Kool-Vent was downsizing and needed only one of its two telemarketing supervisors. Both supervisors were African–American, and both had filed charges of discrimination with the EEOC. He retained Williams because she had a longer tenure at KoolVent and because her productivity was better. Moss requested demotion but was not given another position because of the Marva Greer incident and his consistent problems with lead delivery. Klinzing laid Moss off instead of firing him so that he would be eligible for unemployment. There was no evidence that either Moss' race or the charges Moss filed with the EEOC in January 1994, had any influence on Kool-Vent's decision to lay him off in May.

We find for the defendant on the claims of retaliatory discharge alleged by both plaintiffs.

## CONCLUSION

For the reasons set forth above, we find that the plaintiffs to this action, Lawrence Moss and Arthur Basnight, have failed to prove that they were not promoted to certain positions within the KoolVent organization because of their race or because they had filed charges of discrimination with the EEOC or other agencies. Accordingly, we find for the defendant, KoolVent Aluminum Products, Inc., and against the plaintiffs on these claims.

We further find that the plaintiffs have failed to prove that they were discharged from their employment at KoolVent because of their race or because they had filed charges of discrimination, and we find for the defendant and against the plaintiffs on these claims.